UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TERESA M. WAITT,                    )
                                    )
                Plaintiff,          )    CIVIL ACTION NO.
                                    )    11-10569-DPW
v.                                  )
                                    )
MICHAEL J. ASTRUE, Commissioner     )
Social Security Administration      )
                                    )
                Defendant.          )


MEMORANDUM AND ORDER
June 19, 2012

Teresa M. Waitt appeals the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").  After consideration of the record before me, which I find provides substantial evidence for the denial, I will affirm the Commissioner's decision.

**I.  BACKGROUND**

*A.  Medical History*

Waitt was born on August 20, 1961.  She has a long history of asthma and obesity and a more recent documented history of mental impairments.

1.   Medical Records

i.   Physical Impairments

As ALJ Fulton noted, the medical record documenting the early years of Waitt's claimed disability is sparse.

In late October, 2007, Dr. Lyndonna Marrast noted that the claimant came in for a physical exam and had not seen a doctor for some time.  Dr. Marrast stated that the claimant reported exacerbation of her asthma due to exposure to cats on the day before her appointment.  Waitt also reported worsening of her asthma since starting Atenolol for her blood pressure.  Dr. Marrast stated that she would give the claimant a "prednisone burst" and would consider "additional medical management" at her next visit.

In November, 2007, Dr. Monica Manandhar noted that the claimant was taken off of Atenolol due to her asthma, had started taking Loratedine, was staying away from the cat, and felt her asthma was better.  Later that month, Michele Crissman, RNP, noted that the claimant was complaining of wheezing, that her asthma was exacerbated several weeks prior and had not stopped, and that her asthma was always bad at that time of year. Crissman started the claimant on Flovent, an inhaled steroid controller medication.

In January, 2008, Donna Smith, L.P.N., noted that the claimant "report[ed] that her breathing has much improved since using the Flovent.  States that in the last few days she has not had to use the albuterol inhaler whereas in the past she would use it daily.  She does report using the [F]lovent > 2 times daily.  Her asthma symptoms are triggered by cats and dogs."

2

Later that month, Dr. Manandhar noted that the claimant had discussed her asthma symptoms with Dr. Marrast, and described the symptoms as "well-controlled with [F]lovent."

In January, 2009, Dr. Marrast stated that the claimant "medically says she is dong well, uses inhaler 3 times per week." She noted that the claimant was "moderately obese."  In February, 2009, Dr. Marrast noted that the claimant's lungs were clear and no wheeze was present.  In late April, 2009, Dr. Marrast noted that Waitt did not have to use her inhaler often.  In June, 2009, Dr. Marrast noted that Waitt had not had recent asthma attacks but might need a nebulizer machine because she knew she would be evicted that week and would be moving in with a friend who had cats.

The claimant's medical records also discuss hypertension, a rash, a cyst, high cholesterol, gastroenteritis, and pancreatitis.[1]

> ii.  Mental Impairments

In mid-November, 2008, the claimant was prescribed Ativan for her anxiety.  In mid-January, 2009, Dr. Marrast noted that Waitt reported that her common-law husband had passed away approximately one month beforehand.  The claimant told Dr.

---

[1]  I do not detail the content of the medical records regarding these conditions because the ALJ found that they did not constitute severe impairments and the claimant has not challenged that finding.

Marrast that she had become more anxious and requested a mental health referral.

In early February, 2009, Dr. Marrast noted that the claimant was very worried, had a lot of anger, was facing eviction, and was seeing less of her friends as time had gone by since her partner's death. However, Dr. Marrast stated that Waitt was not feeling worthlessness, helplessness, or hopelessness and was neither suicidal nor homicidal. She stated that Waitt was suffering an adjustment disorder with mixed anxiety and depressed mood. Dr. Marrast assigned Waitt a current Global Assessment of Functioning ("GAF") score of 65.[2] In mid-February, Dr. Marrast noted that Waitt was still grieving the loss of her husband and had seen a mental health counselor the previous week. She noted that Waitt was exhibiting symptoms of depression, including decreased sleep duration, decreased energy, and anxiety in a

---

[2] The Global Assessment of Functioning ("GAF") rates overall psychological functioning, taking into account "psychological, social, and occupational functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV"), at 32 (4th ed. rev.2000). "The Global Assessment of Functioning scale ranges from 0 (persistent danger of severely hurting self or others) to 100 (superior functioning). A GAF score of 41–50 indicates serious symptoms and serious impairment in social, occupational, or school functioning. Scores of 51–60 and 61–70 reflect moderate symptoms/moderate impairment in functioning and some mild symptoms/some difficulty in functioning, respectively." *Walker v. Barnhart,* No. 04-cv-11752, 2005 WL 2323169, at *4 (D.Mass.2005) (internal quotation marks omitted).

setting of grief.  She started the patient on Celexa and prescribed Klonopin to replace the previous Ativan prescription.

Before seeing a psychiatrist, Waitt saw Deborah Seiberg, a Licensed Mental Health Counselor, twice.  In early March, 2009, Seiberg noted that Waitt told her she felt better, that she was making connections with family members and had gone for a job interview.  Waitt denied feeling manic.  She stated that she was feeling more anxious and was having a difficulty falling asleep.

In early April, 2009, Dr. Marrast noted that Waitt was having a bad day, and was worried about being evicted.  Waitt told Dr. Marrast that she felt like she was getting panic attacks and was taking more Clonazepan than the prescribed dose.  Dr. Marrast increased Waitt's Celexa dosage and referred her to psychiatry for assistance in medication management.  In late April, Dr. Marrast noted that Waitt was "calm, not tearful, appears positive and hopeful about the future."  Dr. Marrast also noted that Waitt was encouraged to continue with mental health services.

In May, 2009, Dr. Laura Petrillo conducted a psychiatric consultation.  She noted that Waitt told her that she had been depressed for six years and had "always been a little crazy" but could not "say what that means."  Waitt told her that she drank too much.  She reported experiencing hysterical happiness for

four or five days about every other week, during which she would think about doing impulsive things, did not need to sleep, and was very energized.  She reported that she would then crash and feel very depressed for three or four days.  She explained that this had been happening for many years.  She also reported anxiety and panic attacks, as well as decreased concentration and feelings of guilt.  Dr. Petrillo noted that Waitt's insight and judgment were poor, but that she had no suicidal or homicidal ideation.  Waitt was diagnosed with alcohol dependence and a mood disorder.  Dr. Petrillo wrote that "she appear[ed] to have a cyclic mood disorder, which may indicate bipolar disorder" and that "she really needs a mood stabilizer" and "ongoing psychiatric care."

    That month, Waitt began treatment for her alcohol addiction at North Suffolk Mental Health Association with Julie James, a clinician.  In her initial assessment, James stated that Waitt reported drinking three beers in the morning and seven beers each day on a daily basis.  James noted that Waitt was well groomed, agitated, sad, and anxious.  She also noted that Waitt's thought and speech were within normal limits, but that she exhibited no insight, poor judgment, and poor impulse control.  James continued to see Waitt irregularly through December, 2009.  She noted that Waitt was tearful, angry, and upset about her

circumstances, but also that Waitt was generally friendly and cooperative.

In June, 2009, Dr. Marrast noted that she encouraged Waitt to continue seeing Deborah Seiberg while waiting for assignment to a psychiatrist.  She stated that Waitt was taking Klonopin two or three times daily and that Waitt had been advised that she should not take it more than twice per day.  Dr. Marrast also noted that Waitt reported a recent increase in alcohol intake.

In late July, 2009, Dr. Manandhar noted that Waitt called to inform Dr. Marrast that she was living in a shelter and having trouble sleeping.  Dr. Manandhar prescribed Trazodone to help Waitt to sleep.  In mid-September, 2009, Dr. Khaled Mustafa noted that Waitt came in for a Klonopin refill and reported that she had not been able to get a mental health appointment yet. Approximately a week later, he noted that Waitt "need[ed] to see a psychiatrist for a full prescription."

On October 4, 2009, Rosemarie Paolini, NP, conducted a mental health consultation after Waitt was admitted to South Shore Hospital for abdominal pain related to pancreatitis.  Waitt reported to Paolini that she had been taking Celexa and Klonopin daily and that she nonetheless felt that her depression had deepened and that she was having mood swings.  Waitt told Paolini that her symptoms were all worse because of her homelessness, that she was having trouble sleeping, and that her family was not

supportive of her and her children did not know she was homeless.
Waitt denied suicidal ideation.  Paolini noted that Waitt was
alert and oriented, cooperative, pleasant, and somewhat teary.
Paolini stated that Waitt was not suffering from auditory or
visual hallucinations.  Paolini noted that Waitt's speech was
organized and goal-oriented; that her short term memory was
intact; that she exhibited no sign of paranoia or delusion; that
her insight and judgment were adequate; and that she had the
capacity to make her own healthcare decisions.  Paolini
prescribed Lamictal and Trazadone.  In Psychiatry Progress Notes
written on the next two days, Paolini noted no significant
change.

In a Psychiatry Progress Note written on October 7, 2009,
Dr. H. Howard noted that Waitt "[t]olerated the addition of
lamictal and trazodone but continued to feel depressed."  He
stated that she was calm and cooperative; sad, tearful, fearful,
and depressed; expressed linear thoughts; exhibited normal
grooming; had fair attention and concentration and normal memory;
and exhibited intact judgment.  His treatment plan included
continuing multiple psychiatric drugs and increasing Waitt's
prescription for Lamictal as well as continuing to provide
counseling and support.  In a Psychiatry Progress Note written
the next day, Dr. Howard's evaluation was quite similar.  He

noted that Waitt was "less depressed with the further increase of lamictal with better sleep overnight."

In late October, 2009, Waitt was referred by Julie James to Dr. Daniel Debowy, a psychiatrist.  Waitt reported to Dr. Debowy that she had always had a mood problem, but that it began to cause interpersonal problems only after the death of her husband. She told Dr. Debowy that her sleep had improved considerably since she was started on Lamictal.  She reported "mood lability, irritability, anxiety, poor concentration, increased appetite." Dr. Debowy noted Waitt's alcohol and marijuana usage.  He stated that she had been homeless for a year and was living in shelters. He noted that she was well groomed, with a linear thought process, and was depressed.  He stated that she suffered a mood disorder and was a substance abuser.  He assigned her a GAF score of 62.

In November, 2009, Dr. Paolo Cassano met with Waitt while he was covering for Dr. Debowy.  He noted that she was not tapering her Klonopin usage as described by Dr. Debowy and that she was still drinking.  He stated that she was depressed, more anxious, less irritable, and was suffering from insomnia and low energy. He stated that she had poor concentration, low self esteem, and guilty feelings.  He stated that she denied racing thoughts and hyperactivity.  He noted that she stated that she saw mice everywhere.

In early December, 2009, Dr. Debowy met with Waitt.  He
stated that Waitt had not consumed alcohol for roughly a month
and was "feeling less unstable this month."  He noted that her
mood was "better" and her affect was "mildly anxious."  He noted
that Waitt was continuing her therapy with Julie James.  He also
noted that Waitt was having visual hallucinations of mice.
That month, Julie James also stated in her notes that Waitt
reported some success in reducing her alcohol intake.

In late December, 2009, Dr. Cassano met with Waitt again.
He noted that she was depressed and feeling more anxious and
irritable.  He noted that she suffered from insomnia, low energy,
poor self esteem, guilty feelings, and racing thoughts, and that
she still was hallucinating mice.

Dr. Debowy met with Waitt five times in the first three
months of 2010.  In mid-January, he noted that she felt "much
more mood stable" and that her insomnia was "much improved."  In
mid-February, he noted that she was "still prone to depressive
periods, but feels even more mood stable."  In late February, he
noted that she continued her abstinence from alcohol and had been
abstinent from marijuana for one month.  He stated that she was
"[s]till prone to anxious or teary episodes."  In early March, he
noted that Waitt continued to be abstinent from marijuana but had
consumed two alcoholic drinks in one evening after running out of

Klonopin.  He stated that she was "[s]till prone to anxious or teary episodes, but feels these are decreasing."

### iii. Medications

In an undated report submitted at some point after the claimant's applications for SSI and SSDI were initially rejected, Waitt listed her medications and their side effects.  She stated that Albuterol caused shakiness, Celexa gave her insominia and made her jittery, Chantix gave her bad dreams, and Clonazepam gave her nervous jitters.

A Medication List maintained by East Boston Neighborhood Health Center, dated as valid as of March 10, 2009, stated that the claimant was taking Celexa, Clonazepam, Benadryl, Enalapril Maleate, Fluticasone Propionate, Hydrochlorothiazide, Hydrocortisone, Lorazepam, Ativan, Loratedine, and Chantix.

### 2.  Medical Opinions

#### i.  Physical Impairments

In April, 2009, Dr. Marrast completed a Respiratory Impairment form.  She stated that Waitt suffered from asthma triggered by cats and pollen.  She stated that Waitt had suffered from one severe asthmatic episode over the last twelve months. She noted that Waitt weighed 224 pounds.

In June, 2009, Dr. Marrast filled out a general form for the Social Security programs.  She noted that Waitt had a history of asthma, hypertension, tobacco dependence and depression.  She

11

stated that Waitt had "no physical limitations" and was most
incapacitated by her mental health problems.

In May, 2009, Dr. Mark Colb completed a Physical Residual
Functional Capacity Assessment.  He stated that Waitt's primary
diagnosis was asthma and her secondary diagnosis was obesity.  He
noted that she also alleged high blood pressure.  He found that
Waitt could sit, stand or walk for about six hours during an
eight hour day.  He found that she could occasionally lift up to
fifty pounds, could frequently lift up to twenty five pounds, and
could push and pull unlimitedly.  He found that she could
occasionally climb and could frequently balance, stoop, kneel,
crouch, and crawl.  He found that she had no manipulative
limitations, no visual limitations, and no communicative
limitations.  He found that she should avoid concentrated
exposure to extreme cold and fumes, odors, dusts, gases, poor
ventilation, etc.  He noted that her asthma was "moderate and
controlled" with "no record of significant recent exacerbation,"
that she had self-reported obesity, and that there was not
significant documentation of her high blood pressure.

In mid-March, 2010, Dr. Richard Goulding completed a
Physical Residual Functional Capacity Assessment form.  He stated
that Waitt could occasionally lift or carry up to twenty pounds
and frequently lift or carry up to ten pounds.  He stated that
she could stand, walk, or sit for a total of about six hours in

12

an eight hour work day and that she could push or pull without limitation.  He stated that the record established no postural, manipulative, visual, or communicative limitations.  He stated that Waitt should avoid concentrated exposure to extreme cold; extreme heat; and fumes, odors, dusts, gases, poor ventilation, etc.

     ii.  Mental Impairments

In April, 2009, Deborah Seiberg (with co-signer Dr. Marrast) completed a Psychiatric Disorder form with regard to the claimant.  Seiberg noted that she had seen Waitt twice.  She assigned Waitt a Global Assessment of Functioning score of 65. She noted that the Waitt was forgetful, and that when Waitt was stressed her anxiety level increased.  She stated that Waitt had an upcoming appointment with a consulting psychiatrist, and noted that Waitt was prescribed Celexa and Klonopin.  She answered many questions with "unknown," presumably due to the brevity of the treatment relationship at that point.

Also in April, 2009, Dr. Marrast completed a Nervous Condition form.  She stated that Waitt suffered from depression and anxiety.  She noted that Waitt had not been hospitalized for psychiatric reasons.  She stated that Waitt was attentive to her personal appearance, got along adequately with other people, and could travel independently in public, but that Wait could not deal with routine stress and had exhibited memory, concentration,

or attention deficits.  She stated that there had been significant deterioration in Waitt's habits, interests, relationships, or daily activities.  She noted that a psychiatric referral was pending.

In June, 2009, S. Fischer, Psy.D., completed a Psychiatric Review Technique form.  Dr. Fischer found that Waitt suffered from an affective disorder--in particular, adjustment disorder-- but that the impairment was not severe.  Dr. Fischer found that Waitt had mild restrictions on her activities of daily living and mild difficulties in maintaining concentration, persistence, or pace and in maintaining social functioning.  Dr. Fischer also found no episodes of decompensation of extended duration.  Dr. Fischer found that the evidence did not establish the "C" criteria for the listings.[3]

---

[3] Paragraph C of listing 12.04 (affective disorders) requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." 20 C.F.R. § 404, Subpt. P, App. 1, § 12.04(C). Paragraph C of listing 12.06 (anxiety related disorders) requires that the applicant's medically documented anxiety disorder "[r]esult[] in complete inability to function independently outside the area of one's home." Id. at § 12.06(C).

In January, 2010, Jane Metcalf, Ph.D., completed a
Psychiatric Review Technique form.  She found that Waitt suffered
from bipolar syndrome and anxiety disorder, as well as substance
addiction.  She found that Waitt had mild restrictions on her
activities of daily living; moderate difficulties in maintaining
social functioning; moderate difficulties in maintaining
concentration, persistence, or pace; and one or two episodes of
decompensation of extended duration.  She found that the evidence
did not establish the presence of the "C" criteria.  Dr. Metcalf
stated that Waitt was depressed and suffered from panic and
anxiety.  She noted that Waitt was homeless, used marijuana
daily, and was in early remission from alcohol addiction.

Dr. Metcalf completed a Mental Residual Functional Capacity
Assessment on the same date.  She stated that Waitt was not
significantly limited in her abilities to remember locations and
work-like procedures; to understand and remember very short and
simple instructions; to carry out very short and simple
instructions; to sustain an ordinary routine without special
supervision; to work in coordination with or proximity to others
without being distracted by them; to make simple work-related
decisions; to interact appropriately with the general public; to
ask simple questions or request assistance; to get along with
coworkers or peers without distracting them or exhibiting
behavioral extremes; to maintain socially appropriate behavior

15

and to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar place or use public transportation; and to set realistic goals or make plans independently of others.

Dr. Metcalf stated that Waitt was moderately limited in her abilities to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration fo extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweed without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to respond appropriately to changes in the work setting.  Dr. Metcalf stated that Waitt was in treatment and her mood was slowly improving, and that while Waitt was forgetful, there was no evidence of significant memory problems and Waitt's GAF was in the 60s.

Dr. Metcalf stated that with continued sobriety, treatment, and medication, Waitt could (1) understand simple instructions; (2) sustain focus and pace on simple tasks in two hour blocks totaling eight hours a day and forty hours a week; (3) work with a supportive supervisor; and (4) adapt to a low stress, predictable work setting.

16

In mid-March, 2010, Dr. Debowy completed a Psychiatric
Disorder form.  He stated that Waitt exhibited a depressed mood,
but was groomed, cooperative in sessions, and showed a linear
thought process.  He noted that he did not have "enough data to
speak to reading or ability w/chores."  He stated that Waitt's
mood disorder "often derail[ed] [her] train of thought" and that
criticism could do the same.  He stated that she had anxiety
around new people and that her anxiety made travel difficult.  He
noted that she had tearful episodes and relapses in response to
stress.  He stated that within treatment, Waitt could remember
work-like tasks and instructions.  Regarding Waitt's prognosis,
Dr. Debowy wrote that she was "still relatively early in
treatment, and is expected to gain greater mood stability +
lessened anxiety [within] 12 mos."

In August, 2010, Dr. Debowy completed a Medical Source
Statement of Ability to Do Work-Related Activities (Mental).  He
stated that Waitt suffered mild limitations in her abilities to
understand and remember simple directions and carry out simple
directions; moderate limitations in understanding and remembering
complex instructions; and marked limitations in her abilities to
make judgments on simple work-related decisions, carry out
complex instructions, and make judgments on complex work-related
decisions.  He noted that Waitt had not been able to continue
multi-step work-related tasks during the time that he had been

17

treating her, and that her mood liability impaired her
concentration so that it was difficult to do more than taking her
medication and cleaning her living area.  He stated that Waitt
suffered mild limitations in her ability to interact
appropriately with the public, moderate limitations in her
ability to interact appropriately with supervisor(s), and marked
limitations in her abilities to interact appropriately with co-
workers and to respond appropriately to usual work situations and
to changes in a routine work setting.  He noted that Waitt had
been unable to maintain "non-therapeutic alliances" or to "take
non-therapeutic instructions from others" and that she "found it
difficult to tolerate mild frustration."

## B.   *Procedural History*

On February 25, 2009, Waitt filed an application for SSDI
and SSI alleging disability beginning April 1, 2001.  The claims
were denied on June 9, 2009, and again on reconsideration on
April 12, 2010.  On October 26, 2010, after an administrative
hearing, ALJ Stephen C. Fulton issued a decision finding Waitt
not disabled.  The Decision Review Board selected the ALJ's
decision for review, but did not complete its review within
ninety days, at the end of which the ALJ's decision became final.

1.   Application and Appeals

In her application and during the appeals process, the claimant discussed her medical conditions, her treatment, and her daily activities.

In a questionnaire completed on April 15, 2008, Waitt stated that her emotional pain began in 1992 after her father passed away.  She stated that in a typical day she socialized, did household chores (within limits), and cooked.  She stated that she could not "get out of [her] emotional 'funk.'"

In a Function Report dated April 15, 2009, Waitt stated that on a typical day, she would make her bed, do chores, cook meals, go to medical appointments, watch television, read, converse with friends, and sometimes go to the store.  She stated that sometimes her friends would do her laundry and housework when she could not get out of bed.  She stated that she went to the pharmacy, grocery store, and library on a regular basis, but that she went outside only two to four times a week and sometimes less often.  She stated that she suffered from insomnia from her psychiatric medications, and that she read less and remembered less of the television programs that she watched since her condition had begun.  She stated that she had difficulty with short term memory loss, completing tasks, and concentration, and that she could pay attention for a half an hour through four hours at a time.  She stated that she was "excellent" at

following written instructions but had more difficulty following spoken instructions because of memory problems. She said that she was very inflexible and did not deal with changes in routine or stress well.

In a Breathing Problem Questionnaire dated October 16, 2009, Waitt wrote that she had been seeing a doctor for her breathing problems since childhood, and that it was difficult to walk, bend, and carry all of her possessions (which she needed to do because of her homelessness) due to her breathing troubles.

In a Function Report dated November 16, 2009, Waitt wrote that her daily activities included dressing, getting on the bus, wandering, and eating lunch. She stated that she could not function on a daily basis, that she had no activities of interest, and that her day-to-day activities were mundane. She stated that she was unable to do chores and she had difficulty remembering if she had done chores or laundry after the fact. She stated that she went outside daily because she was homeless, but otherwise she would rarely leave her home. She stated that she could pay attention for three quarters of an hour to two hours at a time. She stated that she followed written instructions well, and that she could follow spoken instructions as well but preferred to use her own ideas and had problems with authority figures. She stated that she was unable to handle stress or changes in routine that were not to her benefit.

In an Activities of Daily Living form filled sometime after the claimant became homeless, she stated that her daily activities included eating breakfast and going to the library. She wrote that she did not spend time with friends and relatives because they were unwilling to spend time with her.  She wrote that she did not finish activities because she would forget what she was doing, that she could only pay attention for five minutes, and that she would forget what she was saying while she was saying it.

    2.  <u>Hearing Testimony</u>

The ALJ held a hearing on August 24, 2010.  Waitt was represented by an attorney.  Both Waitt and Ruth Baruch, an impartial vocational expert, testified.

        i.  Teresa Waitt

The claimant testified about her physical impairments.  She stated that her back hurt, that she had suffered from a bad back for years, and that she could not carry heavy items.  She stated that she had carpal tunnel syndrome due to her previous work at the post office.  She stated that she was in treatment with her primary care provider for asthma, and that she was constantly out of breath and used her fast-acting inhaler more often than previously.  She stated that she had pancreatitis and was hospitalized for it approximately a year prior, but that the tumors were benign.  She explained that she got bad stomachaches

due to the pancreatitis, but that her medication had been increased which "keeps it at bay."

She went into more detail about her mental impairments, explaining that her bipolar disorder "tends to make me forgetful and kind of flighty.  I tend to have like episodes of mood swings and things like that."  She explained that she has difficulty memorizing, remembering, and concentrating, and that she suffered from depression to the point where she spent all of her time by herself and was "kind of always in a funk."  She stated that in retrospect, she could see that her erratic and neurotic behavior stretching back to childhood was caused by her bipolar condition.

Waitt described the impact that her bipolar condition had on her past job performance.  She explained that she was disorganized, made mistakes, and "had emotional breakdowns" at her last job at a movie store.  She stated that some customers would make her "snap," and that she would raise her voice, become hysterical, throw things, and sometimes stamp her feet and march out.  She would sometimes not show up and would sometimes leave in the middle of her shift because she was overwhelmed by all of the people and the bright lights.  She testified that she was asked to leave that job and has not worked since.  She stated that she did not think she could work now because she had apprehension and feelings of doom which made her tardy, because she had difficulty remembering and concentrating that make it

difficult for her to learn, and because she got confused and was disorganized.

Waitt testified that she was in treatment with a psychiatrist and saw him every other week.  The psychiatrist had prescribed medicine, which was helping "slow and steady" although she was "not there yet."  He was continuously increasing the medications "to try to find the perfect fit."  She testified that she also saw a counselor once a month, in between visits to the doctor.  She stated that despite this treatment, she still had "episodes" at least three times a month, in which she would "laugh hysterically and then . . . cry and cry and cry and cry" and then "get angry and then . . . cry."  An episode could last multiple days and even for a week.  She testified that during the episodes she would walk around and talk to herself, and would attempt to read, although reading was difficult.  She explained that she did not become suicidal but just "a little crazy."

Waitt testified that she became homeless in June, 2009, six months after her husband passed away.  She stated that her husband had previously taken care of her.  After he died, she was evicted, and she stayed with various friends but she was "too neurotic for any of them" and they could not handle her talking to herself all of the time.  She then began staying at homeless shelters.  She stated that she was forced to leave every morning, and during the day she generally sat on park benches and talked

to herself.  She returned in the evening and went to bed almost immediately.  She stated that her doctor was not hopeful that she would be able to work, even after adjustment of her medication.

ii.  Ruth Baruch

Ruth Baruch, a vocational expert, responded to various hypothetical scenarios posed by the ALJ.

She considered a hypothetical individual of the claimant's age, education, and vocational background capable of performing at the light exertional level who would need to avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dust and gases and who could understand and remember simple instructions, could concentrate for two-hour periods over an eight-hour day on simple tasks, could interact appropriately with co-workers and supervisors, and could adapt to changes in the work setting.  She testified that such an individual could not perform the claimant's past work because any job involving interaction with the general public is not "simple."  She testified that such an individual could perform other jobs in the national and regional economy, such as bench assembler (for which there are 280,160 jobs nationally and 2,140 jobs in Massachusetts); hand packager inspector (for which there are 467,000 jobs nationally and 8,800 jobs in Massachusetts); and mail sorter (for which there are 137,350 jobs nationally and 4,651 jobs in Massachusetts).

She considered the individual as described above, under the additional condition that the individual would be off-task for greater than twenty percent of the eight hour day and would be absent from work three days a month.  She testified that based on that hypothetical she would "rule out all work" because twenty percent is too high of a portion of the day and three days a month is too high an absenteeism rate to be tolerated by an employer.

3.   Decision of the ALJ

The ALJ engaged in the standard five step evaluation process established by the Social Security Administration under the authority of the Social Security Act.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).[4]

First, the ALJ determined that the claimant's work since April 1, 2001, did not rise to the level of substantial gainful activity.

---

[4]  The First Circuit has summarized the five steps: "1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the applicant's "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted." *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2006).

Second, the ALJ determined that Waitt suffered from several severe impairments.  The ALJ found that Waitt had suffered from asthma and obesity in combination since before March 31, 2003, the date she was last insured for SSDI purposes.  He also found that since April, 2009, the claimant had additionally suffered from depression, anxiety, and bipolar disorder.

The ALJ found that a number of the conditions alleged by the claimant did not constitute severe impairments.  The ALJ found that the claimant's hypertension and high cholesterol were not severe because the claimant did not allege that they caused her any significant limitations; the claimant, in any event, decided not to take cholesterol medication; and the record did not indicate that the claimant had suffered any significant adverse symptoms from these problems.  The ALJ noted that the medical records also showed that the claimant had suffered from gastroenteritis in October, 2009, but he found this impairment to be non-severe because it was treated by antibiotics and the claimant did not proffer any evidence to indicate that the problem was ongoing.  The ALJ found the claimant's pancreatitis to be a non-severe impairment because the claimant did not proffer any evidence to indicate that she had suffered significant adverse symptoms from this condition.  The ALJ additionally found that the claimant's alleged carpal tunnel syndrome and lower back pain did not rise to the level of severe

26

impairments because the evidence on the record did not support a medically determinable diagnosis consistent with either of these conditions.

Third, the ALJ found that the claimant did not have an impairment or combination of impairments that met or was medically equivalent to the listed impairments in the regulations.  The ALJ specifically considered listings 12.04 (Affective Disorders) and 12.06 (Anxiety-related Disorders).

The ALJ stated that paragraph B[5] criteria with regard to either listing 12.04 or listing 12.06 were not met because the claimant had only a moderate limitation in her activities of daily living;[6] suffered only moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and had not experienced any episodes of decompensation. With regard to the claimant's activities of daily living, social functioning, and concentration, persistence, and pace, the ALJ

---

[5] Paragraph B of listings 12.04 and 12.06 requires that the medically documented disorder "[r]esult[] in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  20 C.F.R. § 404, Subpt. P, App. 1, §§ 12.04(B), 12.06(B).

[6] There is some discrepancy in the ALJ's decision, which at one point states that "[i]n activities of daily living, the claimant has mild restriction" and later states that "a moderate limitation in this area of functioning is appropriate."  This discrepancy is not material to the appeal before me.

gave great weight to the assessment of Dr. Metcalf.  With regard to the claimant's episodes (or lack thereof) of decompensation, the ALJ gave less weight to the assessment of Dr. Metcalf and instead based his finding on the record as a whole, including the claimant's testimony and her medical records.

The ALJ also considered whether the Paragraph C[7] criteria were satisfied.  He stated that the evidence did not establish the presence of these criteria with regard to listing 12.04, finding that there was no evidence showing that the claimant had experienced repeated episodes of decompensation of extended duration; or had experienced a residual disease process such that a minimal increase in mental demands or change in the environment would cause her to decompensate; or had a current history of one or more years' inability to function outside of a highly supportive living arrangement and a continued need for such an arrangement.  He also stated that the evidence did not establish the presence of these criteria with regard to listing 12.06, finding no basis for a conclusion that the claimant had a complete inability to function independently outside of the area of her home.

Before proceeding to step four of the evaluation process, the ALJ found that Waitt had

---

[7] *See supra* n.3.

the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she should avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, and gases.  The claimant could understand and remember simple instructions, could concentrate on simple tasks for 2 hour periods over an 8 hour day, could interact appropriately with coworkers and supervisors, and could adapt to changes in the work setting.

12.  In coming to this conclusion, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," but also that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity."

With regard to Waitt's physical impairments, the ALJ gave "great weight" to the opinion of Dr. Goulding and "less weight" to the opinion of Dr. Colb, finding that a capacity to maintain a light exertion level was more consistent with the record as a whole.  He noted that Waitt's treating physician stated that Waitt "ha[d] no physical limitations" due to her asthma and that the record showed Waitt's asthma had improved.

With regard to Waitt's mental impairments, the ALJ gave "great weight" to Dr. Metcalf's opinion and "less weight" to Dr. Debowy's opinion.  He stated that the claimant's daily activities were "not indicative of a person suffering from a debilitating mental health impairment" and that her GAF scores were "indicative of only mild to moderate limitations."  The ALJ

29

stated that Dr. Debowy noted in March, 2010, that the claimant was expected to become more stable and less anxious within twelve months as her treatment progressed.  The ALJ also noted that he gave Dr. Debowy's opinion regarding the claimant's limitations "minimal probative weight" because it was inconsistent with her ability to perform substantial activities of daily living and the medical evidence demonstrating minimal abnormalities.

In step four, the ALJ concluded that based on this determination of Waitt's Residual Fuctional Capacity, Waitt could not perform relevant past work.  Waitt had previously been employed as a census renumerator, front desk receptionist, and video rental clerk.

Finally, in step five the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  The ALJ relied on the testimony of the vocational expert that an individual of Waitt's age, education, work experience, and residual functional capacity could perform the requirements of occupations such as bench assembler, hand packager, and mail sorter.  The ALJ therefore concluded that a finding of "not disabled" was appropriate.  16.

## II.   STANDARD OF REVIEW

Under the Social Security Act, this court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Review is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Although I review questions of law de novo, *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2006), the ALJ's factual findings on behalf of the Commissioner must be treated as conclusive if they are "supported by substantial evidence," 42 U.S.C. § 405(g). Substantial evidence exists where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citation omitted). By contrast, I am not bound by factual findings that are "derived by ignoring evidence, misapplying law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

### III.  ANALYSIS

Under the Social Security Act, an individual is "disabled" and therefore eligible for SSDI and SSI benefits if the individual cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for

a continuous period of not less than 12 months." 42 U.S.C. § 423

(providing definition for purposes of SSDI); 42 U.S.C.

§ 1382(c)(a)(3)(A) (providing definition for purposes of SSI).

Waitt argues that the ALJ erred in failing to find her disabled

because the ALJ incorrectly evaluated (1) the applicant's

credibility and (2) whether the applicant met the criteria of

listing 12.04.

**A.   *Evaluation of the Applicant's Credibility***

The ALJ found that "the claimant's statements concerning the

intensity, persistence and limiting effects of [her] symptoms are

not credible to the extent they are inconsistent with the [ALJ's]

residual functional capacity assessment."  Waitt argues that in

making this determination, the ALJ failed to evaluate her

subjective complaints properly in keeping with the requirements

of *Avery v. Secretary of Health and Human Services*, 797 F.2d 19,

23 (1st Cir. 1986).  The *Avery* Court held that in evaluating a

claimant's subjective complaints, an ALJ should consider:

1.   The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2.   Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3.   Type, dosage, effectiveness, and adverse side-effects of any pain medication;
4.   Treatment, other than medication, for relief of pain;
5.   Functional restrictions; and
6.   The claimant's daily activities.

*Avery*, 797 F.2d at 29.  The "*Avery* Factors" are codified at 20

C.F.R. § 416.929(c)(3).

Waitt contends that the ALJ failed to consider the *Avery* factors because (1) he relied on her trips to the library, attendance of medical appointments, and watching television to show that she could work and (2) he did not address or take into account her medications or their side effects.

### 1.  Daily Activities

The ALJ stated that Waitt's activities of daily living were "not indicative of a person suffering from a debilitating mental impairment."  He noted that Waitt had reported that she "regularly perform[ed] several activities of daily living, such as cooking, cleaning, socializing with friends, going to the library, and attending many medical appointments."

Waitt contends that these activities did not show that her statements regarding her subjective experience of her impairments were not credible.  She argues that her weekly trips to the library were accompanied by sitting on park benches and talking to herself and that her memory and concentration problems forced her to re-read lines in her reading material.  She argues that she only went outside each day due to the schedule of the homeless shelters at which she stayed.  She also argues that her attendance at medical appointments and television-watching did not show that she had the ability to concentrate necessary to work at a job.

The ALJ properly considered Waitt's testimony and other statements regarding her activities of daily living in assessing her credibility regarding her mental impairments.  "While a claimant's performance of household chores or the like ought not to be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding." *Teixeira v. Astrue*, 755 F. Supp. 2d 340, 347 (D. Mass. 2010).  *See also Tavares v. Astrue*, Civil Action No. 11-10153-DPW, 2012 WL 669956, at *13 (D. Mass. Feb. 28, 2012) ("Though [the claimant's] daily activities do not, themselves, show an ability to work, they do support an ALJ's adverse credibility finding.").

Although Waitt's daily activities may not have shown that she had the concentration necessary for a particular job, they do relate to whether her testimony regarding her ability to concentrate and to follow through on tasks was generally credible.  The ALJ did not describe the full context of Waitt's library visits, but the fact that she was motivated to and did read regularly--even if she sometimes had to re-read portions of the material--tends to show certain powers of concentration.  The same applies to her ability to watch television and to keep track of and attend various medical appointments.

Moreover, the ALJ found that Waitt's testimony was incredible only to the extent that it was inconsistent with the

34

residual functional capacity assessment.  Waitt does not explain why her reading, completion of basic household chores, and ability to keep track of and attend her medical appointments were not indicative that she could perform simple tasks, as the ALJ determined.  To support the ALJ's credibility determination, Waitt's daily activities need not demonstrate the ability to perform *every* possible job; they need only to undermine Waitt's allegations that she was not capable of performing even those jobs within what the ALJ decided was her residual functional capacity.

**2.   Medication**

Waitt also contends that the ALJ did not address or take into account her numerous medications and their side effects. However, Waitt (who was represented by counsel) only briefly discussed her medications in her testimony, and she did not discuss any side effects.  Her brief in support of reversing the ALJ's decision does not specify any particular side effect or discuss whether consideration of that side effect would have made a difference in the ALJ's determination.  Waitt's paperwork, the only part of the record addressing side effects, included a form in which she stated that Albuterol caused her some shakiness, Celexa gave her insomnia and made her jittery, Chantix gave her bad dreams, and Clonazepam gave her nervous jitters.

Waitt does not show that any of the side effects in the form, or any other side effects not disclosed, caused incapacities beyond those already included within the residual functional capacity determined by the ALJ.  The ALJ found that Waitt suffered from depression, anxiety, and bipolar disorder. He determined that these impairments moderately restricted Waitt's social functioning and her concentration, persistence, or pace.  Nothing in the record indicates that these side-effects caused more severe difficulties than those already included within the residual functional capacity determination.  Waitt neither argues nor demonstrates that express consideration of the side effects of Waitt's medications would have changed the ALJ's determination.  *Cf. Lacroix v. Barnhart*, 352 F. Supp. 2d 100, 115 (D. Mass. 2005) (ALJ's failure to address the side effects of the claimant's medications was not ground for reversal where the claimant only briefly mentioned such side effects during her testimony, there was no further medical record of the side effects, and the evidence did not suggest that the side effects would cause limitations greater than those suggested by the other medical evidence); *Castro v. Barnhart*, 198 F. Supp. 2d 47, 53 (D. Mass. 2002) (ALJ's failure to address medications and side effects was not ground for reversal where neither the claimant nor her attorney had alleged that the effectiveness of the medications or their side effects were an issue in the case).

**B.   *Listing 12.04***

Waitt contends that her mental impairments meet or equal the criteria of listing 12.04 (affective disorders).   If Waitt did meet the criteria for listing 12.04, she would be automatically disabled under step three.   To meet the listing criteria, Waitt must satisfy either Paragraphs A and B or Paragraph C of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.   *Burke v. Astrue*, Civil Action No. 09-11514-JLT, 2010 WL 4181145, at *5 (D. Mass. Aug 6, 2010).   Waitt's argument appears to be based on a contention that she meets both Paragraphs A and B.

Paragraph B states that the mood disorder described in Paragraph A must result in at least two of the following:

1.   Marked restriction of activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).   Waitt contends that her symptoms meet these listing requirements.[8]

Waitt argues that at the time of the hearing, the most recent medical evidence support marked limitations in (1) her ability to maintain attention and concentration for extended

---

[8] I need not reach whether Waitt's mood disorder satisfies the requirements of Paragraph A because the ALJ's determination that it did not satisfy the requirements of Paragraph B was supported by substantial evidence.

periods, (2) her ability to perform activities within a schedule and maintain regular attendance and to be punctual within customary tolerances, and (3) her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  These three limitations, however, do not appear to address the minimum of two of the four factors under Paragraph B--instead, they appear to address only one such factor (marked difficulties in maintaining concentration, persistence, or pace).  Waitt's arguments do not address restrictions on her activities of daily living, difficulties in maintaining social functioning, or episodes of decompensation.

The ALJ's determination that Waitt did not meet the listing requirements for 12.04 was supported by substantial evidence. The ALJ gave significant weight to the assessment of Dr. Metcalf regarding three of the four factors.  Moreover, "the Secretary's conclusion in this case does not rest solely upon the reports of the nonexamining, nontestifying doctors." *Rodriguez v. Sec'y of Health and Human Servs.*, 647 F.2d 218, 223 (1st Cir. 1981). Indeed, the ALJ also cited the claimant's own descriptions of her daily activities.  He noted that her activities of socializing, performing household chores, cooking, attending medical appointments, going to the library, watching television, and

going grocery shopping support Dr. Metcalf's finding that she did not suffer a marked restriction in her activities of daily living; social functioning; or concentration, persistence, or pace.

Other evidence in the record also supports the ALJ's determination.  Dr. Fischer, another non-examining, non-testifying doctor, found no episodes of decompensation of extended duration and only mild restrictions on Waitt's activities of daily living; maintenance of concentration, persistence, or pace; and maintenance of social functioning. Waitt knew to avoid conflict with others at the shelter, and could focus on television, read with moderate success, keep track of her appointment schedule, and pay her bills.  Her GAF scores did not reflect marked symptoms.

While some of the evidence might support a finding of disability, "the resolution of such conflicts in the evidence is for the Secretary."  *Rodriguez Pagan v. Sec'y of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (per curiam).  Here, "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion." *Rodriquez v. Sec'y of Health and Human. Serv*. 647 F.2d 218, 222 (1st Cir. 1981).  I therefore will not reverse on the ground that Waitt's symptoms met the requirements of listing 12.04.

## IV.   CONCLUSION

For the reasons set forth more fully above, I GRANT the Commissioner's motion to affirm (Dkt. No. 17) and DENY the claimant's motion for an order reversing that decision (Dkt. No. 16).


> **/s/ Douglas P. Woodlock**
> DOUGLAS P. WOODLOCK
> UNITED STATES DISTRICT